## WANLESS IRON CO. v. COMMISSIONER OF INTERNAL REVENUE.
### No. 10080.

Circuit Court of Appeals, Eighth Circuit.
Feb. 14, 1935.

A. L. Agatin, of Duluth, Minn., for petitioner.

Louise Foster, Sp. Asst. to Atty. Gen. (Frank J. Wideman, Asst. Atty. Gen., and Sewall Key, Sp. Asst. to Atty. Gen., on the brief), for respondent.

Doherty, Rumble & Butler, of St. Paul, Minn., amici curiæ.

Harry H. Peterson and William S. Ervin, both of St. Paul, Minn., amici curiæ for state of Minnesota.

Before GARDNER, SANBORN, and VAN VALKENBURGH, Circuit Judges.

GARDNER, Circuit Judge.

This is a petition to review three orders of redetermination entered by the Board of Tax Appeals, and involves petitioner's income tax for the years 1927, 1928, and 1929.

The petitioner is the assignee of two leases made by the state of Minnesota, as lessor, and James Wanless, as lessee, by the terms of which leases James Wanless was granted the right to mine ore on certain state lands, funds from which were to be used for the public schools.

The original lease to Wanless provides that the lessee shall have the right to contract with others to work in mines or to subcontract; the provision being as follows: "The party of the first part further agrees that the party of the second part shall have the right under this agreement to contract with others to work such mine or mines, or any part thereof, or to subcontract the same, and the use of said land, or any part thereof, for the purposes of mining for iron ore, with the same rights and privileges as are herein granted to the said party of the second part."

The lease also contains a recital that "the covenants, terms and conditions of this lease shall run with the land and be in all respects binding and operative upon all subleases, etc.," and contains provision for the payment of royalties as follows: "The party of the second part in consideration of the premises, hereby covenants and agrees to and with the party of the first part, that the party of the second part will, on or before the twentieth (20th) day of April, July, October, and January, in each year, during the period hereinbefore stipulated, or during the period this contract continues in force, pay to the treasurer of the State of Minnesota, for all the iron ore mined and removed from said land during the three (3) months preceding the first (1st) day of the month in which payment is to be made, as aforesaid, at the rate of twenty-five (25) cents per ton, for all iron ore so taken out, mined and carried away, each ton to be reckoned at twenty-two hundred and forty (2240) pounds."

The lease contains provision for the payment of taxes by the lessee "just the same as though the lands herein leased were owned in fee by the said party of the second part."

After securing this lease, which by its terms was for a period of 50 years from May 5, 1900, and which authorized him to take out and remove therefrom the merchantable shipping iron ore, Wanless organized a corporation, the petitioner herein, and in August, 1901, he assigned to it the 50-year lease. This assignment was approved by the commissioner of the state land office of the state of Minnesota, as required by the Minnesota law. Since the assignment, the petitioner has owned the lease, and the lands have been developed by it and by its sublessees, and iron ore has been mined and removed therefrom. The lands leased are part of section 16, which, by the Organic Act of Minnesota, was reserved for the purpose of being applied to schools of the state of Minnesota.

In December, 1902, petitioner subleased a part of this land. In June, 1917, it subleased another part, and in January, 1923, a third part. Each sublease was for a term of two days less than the term of the original state lease. By each sublease, the sublessee covenanted to pay to the treasurer of the state of Minnesota, at the times and in the manner required by the state lease issued to James Wanless and assigned to petitioner, royalties therein provided for, and in addition thereto to pay to the petitioner certain sums of money per ton; to pay all taxes levied on account of the said premises, or upon any ore or ores produced therefrom, or upon any improvements that might be made thereon, or upon any business or occupation that might be carried on upon said premises; and further covenanted that it would not assign said sublease, nor sublet said premises or any part thereof, except with the written consent of the petitioner. One of the subleases was surrendered December 23, 1927.

Under the provisions of these subleases petitioner received income for the years 1927, 1928, and 1929, which it claims is exempt and immune from federal taxation. The Board of Tax Appeals held that this income was subject to tax, holding that: "Since the petitioner is not an agency through which the state immediately and directly exercised its sovereign powers, since petitioner is not intimately connect-

ed with the necessary functions of the state, since the subleases and not the state leases are the source of the petitioner's income here involved, since no direct and substantial burden is laid upon the power of the state to lease its school lands, since effect of the imposition of federal taxation on the petitioner's income herein on the state or its revenue is remote and at best merely conjectural, and since the granting of the immunity sought would unduly impair the taxing power of the federal government, the determination of the respondent that such income is subject to federal income tax is approved."

The Board also expressed the view that the state had waived immunity from taxation. There are, therefore, presented two questions: (1) Is the income received from sublessees immune from federal taxation, in the absence of a waiver from immunity; and (2) if so, has the state waived its immunity from taxation?

Section 18 of the Organic Act of Minnesota (Act of March 3, 1849, c. 121, 9 Stat. 403, 408) provided: "And be it further enacted, That when the lands in the said Territory shall be surveyed under the direction of the government of the United States, preparatory to bringing the same into market, sections numbered sixteen and thirty-six in each township in said Territory shall be, and the same are hereby, reserved for the purpose of being applied to schools in said Territory, and in the States and territories hereafter to be erected out of the same."

By Act of February 26, 1857, c. 60, § 5, 11 Stat. 166, 167, it was provided:

"And be it further enacted, That the following propositions be, and the same are hereby offered to the said convention of the people of Minnesota for their free acceptance or rejection, which, if accepted by the convention, shall be obligatory on the United States and upon the said State of Minnesota, to wit:

"First. That sections numbered sixteen and thirty-six in every township of public lands in said State, and where either of said sections, or any part thereof, has been sold or otherwise been disposed of, other lands, equivalent thereto and as contiguous as may be, shall be granted to said State for the use of schools."

The state of Minnesota accepted these terms of compact by appropriate provisions in its Constitution. Section 2 of Article 8 of the Constitution of Minnesota provides:

"The proceeds of such lands as are or hereafter may be granted by the United States for the use of schools within each township of this state shall remain a perpetual school fund to the state. * * * The principal of all funds arising from sales or other disposition of lands or other property, granted or entrusted to this state in each township for educational purposes, shall forever be preserved inviolate and undiminished; and the income arising from the lease or sale of said school land shall be distributed to the different townships throughout the state, in proportion to the number of scholars in each township, between the ages of five and twenty-one years; and shall be faithfully applied to the specific objects of the original grants or appropriations."

By appropriate legislation, the state of Minnesota has authorized the leasing of these school lands containing iron ore.

■ The contract between the state and James Wanless, assigned by him to the petitioner, was a lease and not a sale or conveyance of ore in place. State v. Evans, 99 Minn. 220, 108 N. W. 958, 9 Ann. Cas. 520; Boeing v. Owsley, 122 Minn. 190, 142 N. W. 129; State v. Royal Mineral Ass'n, 132 Minn. 232, 156 N. W. 128, Ann. Cas. 1918A, 145; Minnesota Loan & Tr. Co. v. Douglas, 135 Minn. 413, 161 N. W. 158; Pillsbury Flour Mills Co. v. Lake Superior Consolidated Iron Mines, 178 Minn. 254, 226 N. W. 843; Von Baumbach v. Sargent Land Co., 242 U. S. 503, 37 S. Ct. 201, 61 L. Ed. 460; United States v. Biwabik Mining Co., 247 U. S. 116, 38 S. Ct. 462, 62 L. Ed. 1017.

■ There can be no doubt that the maintenance of the public schools in conformity with the Constitution is one of the public duties imposed upon the various governmental and administrative divisions of the state. Jackson v. Board of Education, 112 Minn. 167, 127 N. W. 569; State v. City of St. Paul, 128 Minn. 82, 150 N. W. 389; Board of Education v. Houghton, 181 Minn. 576, 233 N. W. 834. The lease of public lands for the benefit of public schools is the exercise of a function strictly governmental in character. Burnet v. Coronado Oil & Gas Co., 285 U. S. 393, 52 S. Ct. 443, 445, 76 L. Ed. 815.

The income here questioned is not that of the original lessee, James Wanless, but is the net income which the petitioner, Wanless Iron Company, received, not from an actual operation of the mines, but in the

form of royalties received in turn from its sublessees. By the terms of the contracts between petitioner and its sublessees, the sublessees are required to pay to the state the full amount of the royalties stipulated in its original lease, and royalties so paid form no part of the income here assessed, as it is only the net income that is assessed.

Great reliance is placed upon the decision of the Supreme Court in Burnet v. Coronado Oil & Gas Co., supra. In that case, lands granted by the United States to the state of Oklahoma for the purpose of common schools and dedicated to that purpose were leased by the state to a private mining company for extraction of oil and gas, the state reserving a part of the gross production, the proceeds of which were paid into the public school funds, the lessee taking the remainder. It was held that the lease was an instrumentality of the state in the exercise of a strictly governmental function, and that the income derived from the lease by the lessee could not be taxed by the federal government. In the course of the opinion in that case, it is said: "To tax the income of the lessee arising therefrom would amount to an imposition upon the lease itself."

■ The reason for the immunity is based on "the necessary protection of the independence of the national and state governments within their respective spheres under our constitutional system." Helvering v. Powers et al., 55 S. Ct. 171, 173, 79 L. Ed. — (filed Dec. 3, 1934).

■ While the line of demarcation is often difficult to follow or define, there is a recognized distinction between a nondiscriminatory tax upon the property of an agency of government, although the property is used in or has relation to the business of the agency, where there is only a remote, if any, influence upon the exercise of the functions of government, and a tax which is deemed to impose a direct burden upon the exercise of governmental powers. Willcuts v. Bunn, 282 U. S. 216, 51 S. Ct. 125, 127, 75 L. Ed. 304, 71 A. L. R. 1260; Indian Territory, etc., Oil Co. v. Board of Equalization, 288 U. S. 325, 53 S. Ct. 388, 77 L. Ed. 812; Burnet v. A. T. Jergins Trust, 288 U. S. 508, 53 S. Ct. 439, 440, 77 L. Ed. 925; Denman v. Commissioner (C. C. A. 8) 73 F.(2d) 193.

In Willcuts v. Bunn, supra, profits on the sale of municipal and county bonds are held to be subject to federal tax, although the income in the form of interest from these bonds was confessedly exempt from such taxation. In that case, the court said: "The sale of the bonds by their owners, after they have been issued by the State or municipality, is a transaction distinct from the contracts made by the government in the bonds themselves, and the profits on such sales are in a different category of income from that of the interest payable on the bonds."

In Burnet v. A. T. Jergins Trust, supra, the Supreme Court considered an income tax on the income of an oil company realized from a lease issued by the city of Long Beach, California. In the course of the opinion, it is said: "The levy is not upon the property of the municipality, nor upon the income it derives from its property, is not upon the city's share of the oil recovered, the lease, or the gross income therefrom. The law measures the assessment by the net income of the respondent, whose operations are carried on in a private, and not in a public, capacity for the personal gain of its cestuis que trust."

Holding that the income was not immune from federal taxation, the court further said: "We think that in the present instance the subject of the tax is so remote from any governmental function as to render the effect of the exaction inconsiderable as respects the activities of the city. Compare Alward v. Johnson, 282 U. S. 509, 514, 51 S. Ct. 273, 75 L. Ed. 496, 75 A. L. R. 9. Its collection is not inconsistent with and does not trench upon the immunity of the state as a sovereign. The income of the respondent from the lease is not immune from federal income tax."

In the instant case, the source of the income sought to be taxed was not operations carried on under the state lease, but under a contract or lease between the petitioner, a private corporation, and certain other private individuals or corporations. These contracts were not assignments of the original lease (Craig v. Summers, 47 Minn. 189, 49 N. W. 742, 15 L. R. A. 236), but were subleases, and, as has been observed, contain terms differing from those of the original lease. They are distinct, separate contracts, to which the state of Minnesota is not a party, and the tax here is measured by the net income of the taxpayer arising from its operations in a private capacity for private gain. The sublessees agree to pay the petitioner royalties, and it thus obtained a profit from the sublessees' operation of the mines.

In the Willcuts Case, it was held that so long as the owner of the bonds sustained his original relationship to the state, and received the interest from the state's contract, no tax could be levied on the income; but when that relationship was altered and used as a means of creating profit by a sale of the property, a tax attached to the income so arising. In the instant case, the petitioner has parted with its original and direct relationship with the state, and for private profit has changed that relationship. That net profit is, we think, subject to tax within the rule of Willcuts v. Bunn, and Burnet v. A. T. Jergins Trust, supra.

In view of our conclusion on this branch of the case, it is unnecessary to consider the further contention of the respondent.

The orders of the Board of Tax Appeals are therefore affirmed.